1

2

3

4

5

6

7                    UNITED STATES DISTRICT COURT

8                    EASTERN DISTRICT OF CALIFORNIA

9

10   SENG YANG,                              Case No.  1:16-cv-01863-DAD-MJS (HC)

11          Petitioner,                      **FINDINGS AND RECOMMENDATIONS TO:**

12     v.                                    **(1) DENY MOTION FOR
                                             RECONSIDERATION OF ORDER DENYING**
13   RAYTHEL FISHER, JR., Warden            **APPOINTMENT OF COUNSEL (ECF NO. 17)**

14          Respondent.                     **(2) DENY MOTION FOR EVIDENTIARY
                                             HEARING (ECF NO. 18); AND**
15
                                            **(3) DENY PETITION FOR WRIT OF HABEAS**
16                                          **CORPUS (ECF NO. 1)**

17                                          **(ECF NO. 1)**

18                                          **THIRTY (30) DAY OBJECTION DEADLINE**

19

20          Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas

21   corpus under 28 U.S.C. § 2254. Respondent is represented by Stephen Gregory

22   Herndon of the Office of the California Attorney General.

23          Petitioner raises the following claims: (1) his motion to suppress was improperly

24   denied; (2) there was insufficient evidence to support the conviction for assault with a

25   firearm; and (3) the judge unduly influenced the jury by requiring the jurors to continue

26   deliberations. (ECF No. 1.)

27          As discussed below, the undersigned recommends the petition be denied.

28

1    **I.    Procedural History**

2        Petitioner is in the custody of the California Department of Corrections and

3    Rehabilitation pursuant to the May 23, 2013 judgment of the Fresno County Superior

4    Court, imposing a sixteen year, 4 month determinate sentence for one count of assault

5    on a peace officer with a semiautomatic firearm, with enhancements; and one count of

6    assault on a peace officer with a deadly weapon other than a firearm.  (Lodged Doc. 4 at

7    737.)

8        Petitioner appealed, raising the same claims presented in the instant petition.

9    (Lodged Doc. 15.) On October 27, 2015, the California Court of Appeal for the Fifth

10   Appellate District affirmed the judgment. (Lodged Doc. 18.) Petitioner filed a petition for

11   review in the California Supreme Court (Lodged Doc. 19); it  was summarily denied on

12   July 13, 2016 (Lodged Doc. 20).

13       Petitioner filed the instant petition on December 14, 2016. (ECF No. 1.) On March

14   10, 2017, Respondent filed an answer. (ECF No. 12.) On March 28, 2017, Petitioner filed

15   a traverse. (ECF No. 15.) The matter is submitted.

16       Also before the Court are Petitioner's motions for reconsideration of the Court's

17   order denying appointment of counsel (ECF No. 17) and for an evidentiary hearing (ECF

18   No. 18).

19   **II.   Factual Background**

20       The following facts are taken from the Fifth District Court of Appeal's October 27,

21   2015 opinion. They and are presumed correct. 28 U.S.C. § 2254(e)(1).

### *FACTUAL BACKGROUND*

23
        Appellant did not offer any evidence at trial. The
24       prosecution's case is summarized below.

25       **I. Appellant's Encounter with Law Enforcement.**

26       Shortly after midnight on December 12, 2011, Fresno Police
         Department Officers Bernard Finley and Sergio Gonzalez
27       were dispatched to appellant's residence for a reported
         "family disturbance" involving a male subject. Both officers

28
                                          2

arrived in separate marked patrol vehicles wearing police uniforms.

In response to Finley's knocking, an older woman opened the front door and an outer screened security door. The woman appeared frightened. After opening the door and security gate she immediately walked back towards the end of the hallway and got out of the way without saying anything. Finley could see into the house and saw appellant at the end of a hallway inside a bedroom. Although it was dark outside and the hallway was dark, appellant's room was well lit so Finley had a clear view of him. Finley remained standing at the open front doorway.

Appellant stood approximately three to four feet inside the bedroom but was visible through the bedroom doorway. Finley could not see appellant's right arm or hand. Appellant acted "fidgety" and appeared nervous. Finley ordered appellant to show his hands and to come out of the bedroom. Appellant asked Finley to come inside.

Finley continued to order appellant to show his hands and appellant continued to tell Finley to come inside. Finley drew his service weapon but did not aim it at appellant, holding it in front of his stomach pointed downwards. Finley thought appellant might have mental problems or was under the influence of something

Finley continued to order appellant to show his hands. Appellant continued to make "fidgety movements" and, as appellant moved to his left, Finley saw a black semiautomatic handgun in appellant's right hand. Appellant's gun was pointed downwards and Finley could not see if appellant's finger was on the trigger. Finley alerted Gonzalez about the gun, and Finley raised his weapon and aimed it at appellant. Finley ordered appellant to put down the gun, which appellant did not do. Appellant continued to tell Finley to come inside. At some point, appellant said he had more guns. Finley described appellant as appearing "really agitated, refusing to put the gun down." Finley heard appellant say, "Shoot me. Shoot me." Finley was concerned that appellant "wanted to commit suicide by cop."

Gonzalez had remained outside the residence and stood to the left of Finley in a position where he could not see appellant. Gonzalez heard appellant say he had guns and "Don't shoot me." He heard Finley order appellant to drop his gun and come out, but appellant told Finley to come inside.

3

Gonzalez described appellant as not responding to Finley's commands.

Appellant's younger brother and sister were inside the house in their respective bedrooms during this encounter. Appellant's brother heard officers at the front door identify themselves and a few moments later appellant was told more than once to drop whatever he held in his hands. He heard appellant tell the officers "at least five times" to shoot him in the head or something similar. He did not hear appellant yell anything else to the officers.

Appellant's sister heard her mother open the front door around midnight and she heard the police officers identify themselves. She heard the officers loudly tell appellant more than once to come outside and put his gun down. She heard appellant say more than once that he wanted the officers to shoot him in the head.

Because appellant was not complying and the situation seemed serious, Finley decided to give a "warning shot" to get appellant's attention. Finley told Gonzalez his plan, asked Gonzalez to back up, and he fired a single shot downwards into a flower bed that was next to the front door. After firing, Finley looked at appellant, who did not react. Finley resumed ordering him to put down his gun, and he noticed appellant was starting to breathe very heavily and appeared more agitated. Finley believed the situation was escalating and becoming lethal.

Finley continued to order appellant to put his gun down. Appellant began walking towards the bedroom door, towards Finley, and appellant simultaneously raised his gun arm. Finley could not see the barrel of appellant's weapon. Based on the movement of appellant's right arm, Finley assumed the barrel of appellant's gun was raising up in his direction and appellant might use his gun. Finley fired his weapon once or twice as appellant exited the bedroom and turned towards appellant's right (Finley's left). Finley lost sight of appellant, although he could hear appellant moaning as if he had been shot. Finley and Gonzalez backed away from the front door.

As the officers backed away, Gonzalez saw appellant run across the hallway and Gonzalez believed appellant was still armed. Gonzalez fired once at appellant. Finley thought he heard a shot originating from inside the house. He told Gonzalez they should back up even more and they took

positions away from the residence. Finley then became concerned appellant posed a threat to the remaining family members inside the house so he went back towards the front door. As he moved forward, Finley heard from inside the house "Wait, wait, wait," or "Here you go," or "Here it comes." Finley believed it was appellant's voice. A gun was tossed out of the house through the front door.

Finley got to the front door, looked and saw appellant at the back of the hallway inside the same room. Appellant's back was facing him. Finely ordered appellant to show his hands and appellant immediately turned holding a knife. Appellant started yelling "a war cry" and ran straight towards Finley, who retreated away from the front door in the direction of Gonzalez, who had remained behind. Appellant exited the residence still yelling and carrying the knife. Finley and Gonzalez fired their weapons multiple times at appellant, who stopped running, dropped the knife and fell to the ground.

As appellant was lying on the ground, he asked the officers to shoot him and he said he had another gun. Appellant started trying to reach for his waistband. Finley punched appellant two or three times, and Gonzalez secured appellant's hands and handcuffed him. Other officers arrived and appellant's family was ordered out of the house, and the house was secured. Law enforcement administered first aid to appellant, who was transported to a hospital.

**II. The Forensic Evidence.**

Appellant's knife had an approximate seven-inch blade. Appellant's handgun, a .40–caliber Glock, had eight live cartridges loaded in the magazine but no cartridge loaded in the firing chamber. Appellant's Glock had not been fired that night. Subsequent testing established the Glock was capable of being fired and functioned properly. No other firearms were located at the scene.

Finley fired nine shots that night, and Gonzalez fired 10 shots. Appellant was struck multiple times.

**III. Appellant's Statements While Hospitalized.**

Fresno Police Detective Mark Anthony Yee interviewed appellant in the hospital 11 days after the shooting. The interview was recorded and played for the jury. A more detailed summary of this interview is set forth below in part I.A. of the Discussion.

During the interview, appellant stated his initial two shots that night were "blanks." He indicated he threw his gun down on the ground after shooting the blanks because "I can't do nothing with this." Yee asked if appellant thought he fired two times that night "but they were blanks" and appellant answered, "Maybe two or three, I don't know, but it was blank for sure."

Yee testified at trial that he knew appellant's Glock had not been fired that night. Although the Glock's magazine was loaded, the gun's slide had not been manipulated to load a cartridge into the firing chamber. As a result, the Glock was mechanically incapable of firing even if the trigger had been pulled. Yee thought appellant's statement indicated appellant pulled the Glock's trigger two or three times that night but nothing happened.

People v. Yang, No. F067353, 2015 WL 6460237, at *1–3 (Cal. Ct. App. Oct. 27, 2015), review denied (Jan. 13, 2016).

## III.    Jurisdiction and Venue

Relief by way of a writ of habeas corpus extends to a prisoner under a judgment of a state court if the custody violates the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n.7 (2000). Petitioner asserts that he suffered a violation of his rights as guaranteed by the U.S. Constitution. Petitioner was convicted and sentenced in this district. 28 U.S.C. § 2241(d); 2254(a). The Court concludes that it has jurisdiction over the action and that venue is proper.

## IV.    Applicable Law

The petition was filed after April 24, 1996 and is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Lindh v. Murphy, 521 U.S. 320, 326 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997). Under AEDPA, federal habeas corpus relief is available for any claim decided on the merits in state court proceedings if the state court's adjudication of the claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

6

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

###    A.    Standard of Review

A state court decision is "contrary to" federal law if it "applies a rule that contradicts governing law set forth in [Supreme Court] cases" or "confronts a set of facts that are materially indistinguishable from" a Supreme Court case, yet reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005) (citing Williams, 529 U.S. at 405-06). "AEDPA does not require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied. . . . The statue recognizes . . . that even a general standard may be applied in an unreasonable manner" Panetti v. Quarterman, 551 U.S. 930, 953 (2007) (citations and quotation marks omitted). The "clearly established Federal law" requirement "does not demand more than a 'principle' or 'general standard.'" Musladin v. Lamarque, 555 F.3d 830, 839 (2009). For a state decision to be an unreasonable application of clearly established federal law under § 2254(d)(1), the Supreme Court's prior decisions must provide a governing legal principle (or principles) to the issue before the state court. Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003).

A state court decision will involve an "unreasonable application of" federal law only if it is "objectively unreasonable." Id. at 75-76 (quoting Williams, 529 U.S. at 409-10); Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002). "[A]n unreasonable application of federal law is different from an incorrect application of federal law." Harrington v. Richter 562 U.S. 86, 101 (2011) (citing Williams, 529 U.S. at 410) (emphasis in original). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Id. (citing Yarborough v. Alvarado, 541 U.S. 653, 664 (2004)). Further, "[t]he more general the rule, the more leeway courts have in reading outcomes in case-by-case

determinations." Id.; Renico v. Lett, 130 S. Ct. 1855, 1864 (2010). "It is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme Court]." Knowles v. Mirzayance, 556 U.S. 111, 122 (2009).

### B.    Requirement of Prejudicial Error

In general, habeas relief may only be granted if the constitutional error complained of was prejudicial. That is, it must have had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 121-22 (2007) (holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness). Some constitutional errors, however, do not require a showing of prejudice. See Arizona v. Fulminante, 499 U.S. 279, 310 (1991); United States v. Cronic, 466 U.S. 648, 659 (1984). Furthermore, for claims alleging ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668 (1984), the Strickland prejudice standard is applied and courts do not engage in a separate analysis applying the Brecht standard. Avila v. Galaza, 297 F.3d 911, 918, n.7 (2002); Musalin v. Lamarque, 555 F.3d 830, 834 (9th Cir. 2009).

### C.    Deference to State Court Decisions

"[S]tate courts are the principal forum for asserting constitutional challenges to state convictions," not merely a "preliminary step for a later federal habeas proceeding." Richter, 562 U.S. at 103. Whether the state court decision is reasoned and explained, or merely a summary denial, the approach to evaluating unreasonableness under § 2254(d) is the same: "Under § 2254(d), a habeas court must determine what arguments or theories supported or . . . could have supported, the state court's decision; then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court]." Id. at 102. In other words:

As a condition for obtaining habeas corpus relief from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

Id. at 103. Thus, the Court may issue the writ only "in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." Id. at 102.

"Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the claim rest on the same grounds." See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991). This is referred to as the "look through" presumption. Id. at 804; Plascencia v. Alameida, 467 F.3d 1190, 1198 (9th Cir. 2006). Determining whether a state court's decision resulted from an unreasonable legal or factual conclusion, "does not require that there be an opinion from the state court explaining the state court's reasoning." Richter, 562 U.S. at 98. "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." Id. ("This Court now holds and reconfirms that § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'").

IV.    **Review of Petition**

    A.    **Claim One: Motion to Suppress**

Petitioner contends that his waiver of Miranda rights was invalid because, at the time of the waiver, he was on "powerful drugs" and had recently been removed from "life support." He states he was not cogent and was in extreme pain. Additionally, he faults the interrogating officer for failing to obtain medical clearance before interrogating Petitioner. He therefore contends that his motion to suppress should have been granted.

1    **1.    State Court Decision**

2        The California Supreme Court summarily denied this claim. Accordingly, the Court

3    "looks through" the Supreme Court's decision to the reasoned decision of the Fifth

4    District Court of Appeal. See Ylst, 501 U.S. at 804. The Court of Appeal rejected the

5    claim as follows:

6        **I. The Trial Court Did Not Err in Denying Appellant's
         Motion to Suppress**.
7

8        **A. Background.**

9        Prior to trial, appellant sought to suppress his statements to
         Yee pursuant to Miranda. A hearing pursuant to Evidence
10       Code section 402 occurred. Below is a relevant summary of
         Yee's testimony from that hearing.
11

12       Yee met with appellant in the intensive care unit at a local
         hospital 11 days after the shooting. Another officer,
13       Claiborne, was present. A police officer had been at
         appellant's side at all times in the hospital because appellant
14       was in custody. No other patients or medical personnel were
         present during Yee's interview.
15

16       Until the day of the interview appellant had been unable to
         speak due to his medical condition. Yee would routinely
17       check each day on appellant's status, speaking with the
         officer assigned that day to watch him. On the day of the
18       interview, Claiborne informed Yee that hospital personnel had
         removed some type of "tubing or some kind of medical
19       apparatus" from appellant, which enabled him to speak.

20       Appellant's room was in a locked and secured facility, and
         Yee had to announce his presence and the reason for his
21       visit before he was buzzed in. Yee did not talk to medical
         personnel regarding his condition before the interview.
22       Appellant had bandages on his abdomen, legs and arms
         when Yee spoke with him. Yee knew appellant had
23       undergone surgery but he did not know when that had
         occurred. Appellant was attached to intravenous and
24       monitoring devices. Yee was not aware if appellant was
         hooked to a catheter, and he did not know if appellant had
25       received any medications.
26

27       Yee woke appellant, who had been asleep when Yee walked
         into his room. Yee introduced himself as a detective with the
28

Fresno Police Department, and said he was there to talk about the incident from the night appellant was shot. Appellant was just waking up and appeared groggy. He cleared his throat often as if he had been coughing. Appellant did not verbally respond but he looked at Yee, nodded his head and made facial expressions that indicated he was hearing. Yee confirmed appellant's name and appellant nodded in response. During the interview, Claiborne wore a full police uniform and remained seated in a chair next to the bed in which appellant was lying. Yee wore a shirt and tie.

Yee stood next to appellant, who was propped up in a seated position. Yee testified he believed appellant understood everything that was asked, his answers were consistent, coherent, and relevant to the incident, and appellant was alert throughout the entire conversation. Based on his training and experience, Yee did not believe appellant was under the influence of any narcotics, but he agreed he would not have allowed appellant to drive based on his injuries. Yee indicated appellant closed his eyes at times during the interview but he did not believe appellant was losing consciousness.

The prosecution played the recording for the court and it was moved into evidence. Below is a summary of appellant's recorded statements.

**1. Appellant's recorded interview.**

Yee read the warnings pursuant to <u>Miranda</u> and asked appellant if he understood each right. Yee indicated on the recording that appellant was nodding. Yee asked appellant if he wanted to talk and appellant said, "Uh, just ask me." When Yee said, "Huh?" appellant stated, "Just ask what you want to find out." Yee asked if appellant recalled the night he was shot. The following exchange occurred.

"[Appellant]: I remember.

"[Yee]: Okay, ... can you tell me what happened?

"[Appellant]: Nothing happened. I told you. I went and bought the gun.

"[Yee]: You bought ... a gun?

"[Appellant]: That day.

"[Yee]: That same day?

"[Appellant]: Same day.

"[Yee]: Oh, okay. Why did you buy that gun for?

"[Appellant]: For my own protection.

"[Yee]: Oh, okay.

"[Appellant]: From Halloween.

"[Yee]: Okay.

"[Appellant]: I was thinking Halloween.

"[Yee]: Okay. And then so after you bought the gun what happened?

"[Appellant]: I bought the gun—I bought—

"[Yee]: Do you remember the police coming to your house?

"[Appellant]: I forgot what day, okay.

"[Yee]: Okay.

"[Appellant]: And then, uh,—and then, um, um,—

"[Yee]: Do you remember when you were ... shot?

"[Appellant]: Uh, ... I bought that gun."

Appellant then said his brother told him to run and get away from the door, but appellant did not understand what his brother meant. Appellant then "saw a black police officer" at the corner of the door, which scared appellant because the officer could have shot him, his little brother or his mother. Appellant said he backed up and indicated he would "throw the gun out." The officer indicated he was "coming in." Appellant said he was shot without doing anything and "then I went and ran out, and he was at the door, and my first two shot [sic] was blanks." Appellant threw the gun on the ground because "I can't do nothing with this." Appellant then retrieved a knife, which was on his bed, and he threw his gun out. He ran outside, upset that the officers were shooting him even though he had not done anything. The two officers shot him.

Appellant indicated he did not know why the police were at his residence that night. He denied telling family members he wanted to hurt himself.

Yee asked if appellant thought he fired two times but they were blanks. Appellant answered, "Maybe two or three, I don't know, but it was blank for sure." Appellant confirmed his gun was a Glock, he used .40–caliber ammunition, and he bought the Glock legally from a gun dealer. Appellant denied wanting to hurt anybody on the night of the shooting.

Yee concluded the interview at 11:05 a.m. The recording lasts 11 minutes and 51 seconds. [FN2]

> [FN2: In a footnote, appellant contends the recording may have been edited to eliminate pauses based on "the many clicks and similar sounds" appearing therein. Although appellant does not claim that his or Yee's words were altered in any way, he asserts the recording "may not necessarily accurately reflect [his] lapsing in and out of consciousness when he closed his eyes." Appellant admits in the same footnote that he did not raise this point below. "Points not raised in the trial court will not be considered on appeal." (Hepner v. Franchise Tax Bd. (1997) 52 Cal.App.4th 1475, 1486.) Accordingly, we will not consider the arguments or issues raised in appellant's opening brief at footnote number 16.]

### 2. Cross-examination regarding "Halloween" and firing "blanks."

On cross-examination, Yee testified that even though the shooting occurred in December he was not concerned when appellant said he purchased the gun on the same day as the incident. Based on his investigation before the interview, Yee knew appellant had purchased his gun around Halloween in October of 2011. Yee believed appellant was mistaken when he purchased the gun and he did not find it odd that appellant said he needed to buy a gun for protection "from Halloween."

Yee was not concerned regarding appellant's comment about firing "blanks" because Yee knew appellant's gun had not been fired on the night of the shooting and it had been loaded with live ammunition.

### 3. The trial court's ruling.

Following arguments from both counsel, the trial court found appellant gave an implied waiver of his <u>Miranda</u> rights after he was advised of those rights, nodded in response and then twice told Yee to ask questions. The court found no suggestion appellant had low intelligence or suffered from a mental condition. The court noted that based on Yee's training and experience, Yee did not believe appellant was under the influence of any drugs or narcotics which would impact his ability to give a waiver. No language barrier appeared between Yee and appellant.

The court noted that <u>People v. Perdomo</u> (2007) 147 Cal.App.4th 605 (<u>Perdomo</u>), which defense counsel had cited, "does not speak in terms of statements being consistent to the questions asked, but rather, to the statements being responsive or appropriate to the questions asked." The court determined that based on the transcript and recording, appellant's statements were consistent such that appellant "knew what he was being asked and provided the answers that he could to the questions that were asked."

The court addressed appellant's "Halloween" reference, finding it interesting appellant's family had allegedly summoned law enforcement to their home on Halloween in 2011. Based on that, the court commented appellant apparently felt he needed protection and bought a gun. The court found that appellant's answer about why he bought a gun was "pretty consistent, pretty responsive, pretty appropriate, given the context."

The court did not find that appellant's speech was slurred. The court noted the interview was deliberate and conversational. Appellant wanted Yee to know he was not a violent person. Based on all of the circumstances, the court denied appellant's motion to exclude his statements, holding he gave a knowing and intelligent waiver, and he had the capacity to do so.

### B. Standard of review.

The prosecution bears the burden of demonstrating the validity of a defendant's waiver of his <u>Miranda</u> rights by a preponderance of the evidence. (<u>People v. Dykes</u> (2009) 46 Cal.4th 731, 751; <u>see</u> <u>Berghuis v. Thompkins</u> (2010) 560 U.S. 370, 384.) There is a threshold presumption against finding a waiver of <u>Miranda</u> rights but the question ultimately is

whether a Miranda waiver was voluntary, knowing, and intelligent under the totality of the circumstances. (People v. Williams (2010) 49 Cal.4th 405, 425.) "On appeal, we conduct an independent review of the trial court's legal determination and rely upon the trial court's findings on disputed facts if supported by substantial evidence." (Ibid.)

The inquiry regarding whether a defendant has validly waived his rights under Miranda, supra, 384 U.S. 436, has two distinct dimensions. (Moran v. Burbine (1986) 475 U.S. 412, 421.) First, the waiver must have been voluntary, which means a free and deliberate choice not based on intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of the rights being waived and the consequences of the decision to do so. A court may properly conclude Miranda rights were validly waived only if the totality of the circumstances shows both an absence of coercion and the requisite level of comprehension. (Ibid.)

**C. Analysis.**

Appellant contends Yee's actions constituted coercive police conduct because he knew appellant was vulnerable and he exploited appellant's serious medical condition (evidenced by 11 days in the intensive care unit) without first checking with medical personnel.[FN3] Appellant asserts Yee woke him up, he was groggy throughout the interrogation, he kept closing his eyes, which he argues shows a loss of "consciousness," his voice was weak, and he was "seriously confused at times" due to responses that were "patently incredible" and contrary to the facts and circumstances. He argues the tone of his voice reflected "great physical discomfort" throughout the interview. He maintains the trial court's findings were not supported by substantial evidence.

> [FN3: In a footnote, appellant provides Internet hyperlinks to support his contention intubation for 11 days establishes he was "very seriously ill" and his extended period of intubation and condition evidences a significant likelihood "he was also heavily sedated." Respondent objects to this material. We will not consider the points raised in appellant's opening brief at footnote number 15 because they are not included in the record from the proceedings below. (People v. Pearson (1969) 70 Cal.2d 218, 221, fn. 1; Hepner v. Franchise Tax Bd., supra, 52 Cal.App.4th at p. 1486.)]

Four cases are instructive regarding appellant's contentions.

First, in Mincey v. Arizona (1978) 437 U.S. 385 (Mincey) the defendant was shot and hospitalized following a police raid of his apartment which left an officer dead. The defendant was treated in the emergency room before being moved to the intensive care unit. Tubes were inserted into his throat and nose, and a catheter was inserted into his bladder. He received various medications and a device was attached so he could be fed intravenously. (Id. at p. 396.) Around 8:00 p.m. the same day, a police detective interrogated him in the intensive care unit. The defendant was told he was under arrest, given Miranda warnings, and then questioned about the shooting. The defendant could not speak because of the tube in his mouth and he wrote answers on a piece of paper. The questioning continued until almost midnight despite the defendant's repeated requests to stop. The defendant requested the assistance of counsel several times before responding, and he complained of unbearable pain. Some of his written responses were incoherent, showed confusion and an inability to think clearly about the events at his apartment. (Id. at pp. 398–399.) The defendant complained several times that he was confused. (Id. at pp. 400–401.) The detective stopped the questioning only when the defendant lost consciousness or received medical treatment. (Id. at p. 401.)

The United States Supreme Court held the defendant's statements were not based on his free and rational choice. (Mincey, supra, 437 U.S. at p. 401.) The defendant was unable to escape the questioning given his medical condition and was at the mercy of the detective. (Id. at p. 399.) The undisputed evidence showed the defendant did not want to answer the detective's questions. Mincey determined the defendant's will was overborne because he was barely conscious, weakened by pain and shock, and isolated from friends, family and counsel. Accordingly, his statements were inadmissible against him at trial. (Id. at pp. 401–402.)

Second, in People v. Whitson (1998) 17 Cal.4th 229 (Whitson) the defendant was convicted of two counts of second degree murder stemming from a motor vehicle accident. Over Miranda objections, the prosecution admitted incriminating statements the defendant made to police officers in the course of three interviews. (Id. at p. 235.) The first interview occurred with three police officers in a hospital emergency room approximately three hours after the accident. The defendant was read his Miranda rights, and he said he understood in a normal and clear voice. The interview lasted approximately 10 minutes and the defendant never

requested an attorney or indicated a desire not to speak. The interview was not recorded and the testifying officer said the defendant never indicated he was in considerable pain. (Id. at p. 237.) A second police interview occurred later that same day and a final interview occurred nine days after the accident, both in the hospital. The police readvised Miranda rights on both occasions. The defendant said he understood and agreed to talk. (Id. at pp. 238–239.)

At a pretrial suppression hearing, the defense introduced the following evidence. The defendant's stepfather arrived at the hospital a little more than one hour after the defendant's initial interview with law enforcement. At that time the defendant was in and out of consciousness, took several minutes to recognize the stepfather, the defendant had blood all over him, he appeared to be in great pain, his voice was neither loud nor clear, and his answers to the stepfather were nonresponsive. (Whitson, supra, 17 Cal.4th at p. 240.) A clinical psychologist characterized the defendant as having anywhere from mental retardation to borderline intelligence. The surgeon who examined the defendant said the defendant did not remember the accident shortly after his arrival to the hospital. (Ibid.) Despite these concerns, the trial court determined the defendant gave valid Miranda waivers. The Court of Appeal reversed but the Supreme Court reversed again.

Regarding the voluntariness of the waiver, Whitson found nothing in the record to show the police used physical or psychological pressure. To the contrary, the defendant's willingness to speak with the officers was readily apparent. The defendant was not worn down by improper interrogation tactics, lengthy questioning, tricks or deceit, and he was not induced with improper promises. Whitson held it was clear the defendant gave a voluntary waiver. (Whitson, supra, 17 Cal.4th at pp. 248–249.)

Whitson then addressed whether the defendant was aware of his rights and the consequences of waiving. The defendant was advised of his Miranda rights at each of the three interviews. On each occasion, the defendant affirmatively told the officers he understood those rights. The defendant did not appear to be under the influence of drugs and his answers were responsive to the questions asked. (Whitson, supra, 17 Cal.4th at p. 245.) Although the defendant had been "seriously injured" in the accident, there was "no direct evidence" the defendant's judgment was clouded or impaired by pain, medications, or surgical procedures. (Id. at p. 249.)

Whitson acknowledged questions existed regarding the defendant's condition when he was first interviewed by police, but the record supported the trial court's determination the defendant was aware of his rights and knowingly waived them. (Ibid.) Although the defendant possessed relatively low intelligence, he had sufficient intelligence to pass a driver's test and he initially gave false information to the police to deceive them. The defendant had been advised of his Miranda rights during an earlier encounter with police approximately six months before. The Supreme Court determined there was no evidence the defendant lacked sufficient intelligence to understand his Miranda rights or the consequence of his waivers. Therefore, the trial court's ruling was upheld. (Id. at p. 250.)

Third, in People v. Panah (2005) 35 Cal.4th 395 (Panah), the defendant murdered an eight-year-old girl. (Id. at p. 408.) When the defendant was apprehended he had slashed wrists, appeared under the influence of drugs or alcohol, and was uttering nonsensical statements about the victim. The defendant was transported to a hospital for medical treatment and the treating physician testified he found the defendant agitated and delusional. (Id. at p. 416.) The defendant was having auditory hallucinations, acting inappropriately, and the slashes on his wrists appeared to have been self-inflicted. The treating physician concluded the defendant was suicidal, acutely psychotic, and hearing "'command hallucinations'" (ibid.) from figures telling the defendant to kill himself. The physician noted the defendant was under the influence of drugs and could not determine whether the psychosis was a result of the drugs or other factors. (Ibid.) At the hospital, a detective interviewed the defendant after advising him of his Miranda rights, which the defendant waived. (Id. at p. 470.) The trial court found the questioning at the hospital permissible under Miranda, concluding the defendant's medical and psychological condition did not render his waiver involuntary. (Id. at pp. 470–471.)

On appeal, the defendant argued, in part, he was suffering from acute psychosis, was under the influence of drugs, and was suffering from the effects of a suicide attempt when he was admitted into the hospital. The defendant asserted some of his answers to the detective were irrational. (Panah, supra, 35 Cal.4th at p. 472.) The Supreme Court, however, rejected the defendant's claims, noting the detective testified the defendant was "responsive" to the questioning even though the defendant was sometimes irrational during the hospital

interrogation. (Ibid.) Panah found no police coercion involved in the questioning. As a result, it concluded the defendant's statements were not involuntary.

Finally, in Perdomo, supra, 147 Cal.App.4th 605, two law enforcement officers interviewed the defendant in the intensive care unit at UCLA Medical Center. The interview was recorded and occurred four days after the defendant was involved in a vehicle accident that eventually led to his conviction of felony vehicular manslaughter while intoxicated. (Id. at pp. 607, 611.) Prior to the interview, the officers received permission from medical personnel to speak with the defendant. The defendant was lying flat on his bed recovering from a splenectomy, broken ribs and a head injury. He was in obvious pain and had received his last pain medication five and a half hours earlier. During the interview he was connected to intravenous solutions and monitors. The defendant had been connected to a ventilator since the surgery but that device had been removed the day before the interview with law enforcement. The defendant's speech was slow and deliberate, but it was not slurred or raspy following intubation. The interview lasted approximately 20 minutes, including numerous pauses. The officers asked questions in a slow, subdued and deliberate manner about the events occurring before and after the accident. The defendant's answers were responsive to the questions asked. (Id. at pp. 611–612.) The trial court determined his statements were admissible against him as voluntary and made of his own free will. (Id. at p. 613.)

On appeal, the defendant claimed the trial court erred because his will was overborne by officers who exploited his debilitated physical and mental conditions through psychological coercion. (Perdomo, supra, 147 Cal.App.4th at pp. 613–614.) Perdomo acknowledged the defendant was likely under the influence of pain medications during the interview. The interviewing officers thought the defendant appeared under the influence of medication, and one officer testified he would not want the defendant to drive in that condition. In addition, the surgeon who performed the splenectomy opined the combination of the defendant's injuries and medications would adversely affect the defendant's ability to think clearly. (Id. at p. 617.) Despite these concerns, however, Perdomo noted nothing on the tape established impaired thinking by the defendant. Although the defendant's speech was slow and deliberate, it was not slurred or incoherent. The defendant provided

answers that were appropriate to the questions asked. (Id. at pp. 617–618.) No coercive police activity occurred, the interview was short, and the officers were conversational and not threatening. Accordingly, Perdomo held the defendant's statements could not be deemed involuntary. (Id. at p. 619.)

Here, as discussed below, this record demonstrates the prosecution met its burden as to both dimensions based on a preponderance of the evidence standard.

### 1. Appellant's waiver was voluntary.

An express waiver of Miranda rights is not required. (Whitson, supra, 17 Cal.4th at p. 250.) A defendant's decision to answer questions after indicating an understanding of the Miranda rights may support a finding of implied waiver under the totality of the circumstances. (Id. at pp. 247–248.)

Here, appellant nodded after each Miranda right was read to him and nodded when asked if he understood all of his rights. When asked if he wanted to say what happened, appellant told Yee, "Uh, just ask me" and "Just ask me what you want to find out." At no time did appellant ask to stop the questioning, indicate a desire for an attorney, or seek a break in questioning. Appellant indicated his willingness to speak with Yee and his actions throughout the entire interview establish an intent to waive his Miranda rights. (Whitson, supra, 17 Cal.4th at p. 250.)

This record is devoid of any suggestion the police used physical or psychological pressure to elicit statements from appellant. He was not subjected to improper interrogation tactics, trickery, deceit, or lengthy questioning. (Whitson, supra, 17 Cal.4th at pp. 248–249.) Appellant was not induced to provide statements as a result of improper promises. Thus, as in Whitson, the voluntariness of appellant's waiver is clear. (Id. at p. 250.)

### 2. Appellant's waiver was made with a full awareness of his rights.

We next turn to the second component of the analysis, which focuses on whether appellant was aware of the rights he was giving up and the consequences of his decision to do so. (Whitson, supra, 17 Cal.4th at p. 250.) Yee informed appellant he was a detective with the Fresno Police Department and he was investigating the shooting. Appellant nodded in response and said Yee could ask him questions.

Appellant did not appear under the influence of any narcotic. Although appellant's voice sounded raspy at times and he coughed on occasion, we do not agree that his tone of voice reflected "great physical discomfort" throughout the interview.

Appellant asserts he is like the defendant in Mincey. However, appellant did not complain of pain, did not ask to stop the questioning and did not seek the help of legal counsel. Appellant was not interrogated for hours. There is insufficient evidence to determine appellant was slipping in and out of consciousness. Appellant did not complain of confusion, although he did forget which day the police came to his residence. Unlike in Mincey, appellant was willing to answer questions. Mincey is distinguishable.

Appellant, however, contends some of his answers were "patently incredible" and he appeared "seriously confused" at times. He maintains the trial court's determination that he was "rational and coherent throughout the interview is contrary to the record." When asked about the night of the shooting, appellant incorrectly said he purchased his gun that same day for protection "from Halloween." Appellant also said he fired "blanks." However, even if some of appellant's responses could be described as irrational, a position we do not take, those responses, and indeed appellant's answers overall, were responsive to the topic of the shooting. Appellant explained when and why he purchased his gun. He provided details regarding what happened when he first saw the officer at the door and what was said between them. He denied doing anything to justify being shot. He explained throwing his gun and grabbing his knife. He denied knowing why the police were at his residence, and said he and his mother "always yell." He confirmed there were two police officers who shot him. He denied wanting to hurt anyone that night.

Appellant's responses suggest he was capable of understanding the discussion. Indeed, appellant admits in his opening appellate brief that "some" of his answers "seemed responsive and appropriate" to Yee's questions. Although the issue asserted in Panah was whether the defendant's waiver was "involuntary" (Panah, supra, 35 Cal.4th at p. 471), it appears the Panah court also examined whether the defendant there had the capacity to waive his Miranda rights. (Id. at pp. 471–472.) Although the defendant in Panah was described as giving some "irrational" answers, the Supreme Court nevertheless found a valid Miranda waiver because the answers were "responsive" in the absence of police coercion.

21

(Id. at p. 472.) Given <u>Panah</u> 's outcome, appellant's challenge is unpersuasive because he provided answers responsive to Yee's investigation in the absence of police coercion.

Like the defendant in <u>Perdomo</u>, appellant's speech was not slurred. His responses do not suggest he was incoherent. Like the defendant in <u>Whitson</u>, this record does not establish appellant lacked sufficient intelligence to understand his rights or the consequences of his waivers. Appellant had prior experience with law enforcement, which suggests an overall familiarity regarding his <u>Miranda</u> rights. (<u>Whitson</u>, <u>supra</u>, 17 Cal.4th at pp. 249–250.)

As noted above, it was the prosecution's burden to establish the validity of appellant's <u>Miranda</u> waiver by a preponderance of the evidence. Whether it met that burden is an independent determination we make on appeal after examining the totality of the circumstances. (<u>People v. Williams</u>, <u>supra</u>, 49 Cal.4th at p. 425.) We are mindful that appellant was seriously injured, he remained in the intensive care unit from the time of the shooting, and he experienced prolonged intubation. However, the prosecution met its burden based on the totality of this record. Appellant gave a voluntary waiver free of coercion or deception. His waiver was made with a full awareness of both the nature of the rights being abandoned and the consequences of the decision to abandon those rights. (<u>Moran v. Burbine</u>, <u>supra</u>, 475 U.S. at p. 421.) Accordingly, the trial court did not err.

<u>Yang</u>, 2015 WL 6460237, at *3–11.

### 2. Applicable Law

In <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966), the United States Supreme Court held that "[t]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Thus, "suspects interrogated while in police custody must be told that they have a right to remain silent, that anything they say may be used against them in court, and that they are entitled to the presence of an attorney, either retained or appointed, at the interrogation." <u>Thompson v. Keohane</u>, 516 U.S. 99, 107 (1995); <u>Miranda</u>, 384 U.S. at 473-74. Once <u>Miranda</u> warnings have been given, "all questioning

22

must cease" if a suspect makes a clear and unambiguous statement invoking his constitutional rights. <u>Smith v. Illinois</u>, 469 U.S. 91, 98 (1984).

To be valid, a <u>Miranda</u> waiver must be made "voluntarily, knowingly and intelligently." <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986) (citation omitted). "The inquiry has two distinct dimensions." <u>Id.</u> First, the waiver must have been free of "intimidation, coercion, or deception." Second, it "must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." <u>Id.</u> In this regard, the officer must have given the accused a <u>Miranda</u> warning. <u>See</u> <u>Miranda</u>, 384 U.S. at 471. "If that condition is established, the court can proceed to consider whether there has been an express or implied waiver of Miranda rights." <u>Berghuis v. Thompkins</u>, 560 U.S. 370, 388 (2010) (citation omitted). In determining whether <u>Miranda</u> rights have been waived, the Court considers the "totality of the circumstances surrounding the interrogation." <u>Moran</u>, 475 U.S. at 421.

### 3.    Analysis

The state court was not unreasonable in concluding that Petitioner's statements were made voluntarily and with knowledge of the rights he was waiving. In this regard, the instant case is distinguishable from <u>Mincey v. Arizona</u>, 437 U.S. 385 (1978). In <u>Mincey</u>, the defendant made statements only hours after having been admitted to the hospital with serious injuries and "depressed to the point of coma." <u>Id.</u> at 398. He complained of unbearable pain and his statements were obviously confused and incoherent. He also expressed his wish not to be interrogated but, due to his medical encumbrances, was unable to escape the interrogation. Although the defendant expressed his desire to cease questioning and stated that he did not want to talk without a lawyer, the questioning stopped only at intervals when he lost consciousness. <u>Id.</u> at 398-401. "The statements at issue were thus the result of virtually continuous questioning of a seriously and painfully wounded man on the edge of consciousness." <u>Id.</u> at 401. The Supreme Court concluded, in light of all these circumstances, that the

defendant did not want to speak with the detective, and did so only because his will was overborne. Id. at 401-402.

Here, Petitioner was advised that the interrogating officer was a police officer, and he was informed of his rights. As his rights were read to him, he nodded in agreement. (See Lodged Doc. 7.) At the conclusion thereof, he told the officer to question him: "Just ask what you want to find out." (Lodged Doc. 7.) He did not express a desire to cease questioning or complain of pain or confusion. Although some of his statements, such as those regarding Halloween, may at first appear incoherent, they nonetheless made some degree of sense in the context of the information already available to the officer regarding Petitioner's purchase of the firearm. Furthermore, Petitioner's answers were overall responsive to the questions asked and, as described by the state court, conversational in tone. Finally, the questions asked were simple and the questioning was relatively short.

The Court concludes that the totality of the circumstances attending Petitioner's statement does not demonstrate coercive conduct or that Petitioner's will was overborne. Cf. United States v. George, 987 F.2d 1428, 1430–31 (9th Cir.1993) (holding that interrogation in the hospital of a coherent suspect who has received Miranda warnings was not unconstitutional). To the contrary, they reflect a voluntary, knowing, and intelligent waiver of his rights.

Petitioner is not entitled to relief on this claim.

**B.    Claim Two: Sufficiency of the Evidence**

Petitioner claims that there was insufficient evidence to support his conviction for assault with a firearm because he did not point a gun at officers, utter any verbal threat, or employ threatening body language.

**1.    State Court Decision**

The Fifth District Court of Appeal rejected this claim as follows:

**III. The Jury Had Sufficient Evidence to Convict Appellant in Count 1.**

Appellant argues substantial evidence does not exist to support his conviction for assault with a firearm against Finley. He contends his conviction in count 1 must be reversed.

## A. Standard of review.

### 1. Sufficiency of the evidence.

For an appeal challenging the sufficiency of evidence, we review the entire record in the light most favorable to the judgment to determine whether a reasonable jury could have found the defendant guilty beyond a reasonable doubt based on "'evidence that is reasonable, credible, and of solid value....'" (People v. Jones (2013) 57 Cal.4th 899, 960.) In doing this review, we are not required to ask whether we believe the trial evidence established guilt beyond a reasonable doubt. (People v. Johnson (1980) 26 Cal.3d 557, 576.) Rather, the issue is whether any rational jury could have found the essential elements of the crime beyond a reasonable doubt after viewing the evidence favorably for the prosecution. (Ibid.) We are to presume the existence of any fact the jury could have reasonably deduced from the evidence in support of the judgment. (Ibid.)

"An inference is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts found or otherwise established in the action." (Evid.Code, § 600, subd. (b).) It is not permissible to base an inference on mere suspicion, imagination, speculation, conjecture or guess work. (People v. Davis (2013) 57 Cal.4th 353, 360.) A factual finding may be an inference drawn from the evidence but it cannot be based on "'"mere speculation as to probabilities without evidence." [Citation.]' [Citations.]" (Ibid.)

### 2. Assault.

"An assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (§ 240.) An assault with a deadly weapon upon a peace officer occurs when a person commits "assault" upon a peace officer "with a semiautomatic firearm and who knows or reasonably should know that the victim is a peace officer ... engaged in the performance of his or her duties, when the peace officer ... is engaged in the performance of his or her duties, ...." (§ 245, subd. (d)(2).) "'Assault and assault with a deadly weapon are general intent crimes.'" (People v. Valdez (2002) 27 Cal.4th 778, 787.)

## B. Analysis.

Appellant contends there is no evidence he verbally threatened the officers and he never pointed his gun at Finley. He asserts Finley could not see the barrel of his gun when he moved forward out of his bedroom and raised his right (gun) hand. He argues his gun could not have been pointed at Finley because he was "moving away from the officers and their line of sight." He maintains he "never held his gun in a manner that suggested he intended to commit a battery with it." He claims his conviction in count 1 was based on speculation, conjecture, guesswork, or supposition due to how he held his gun and the absence of any verbal threats.[FN4]

> [FN4: In a footnote, appellant challenges Yee's testimony as factually incorrect that appellant could have pulled the trigger two or three times. Appellant provides citations to Internet hyperlinks to support his contention the trigger on a Glock semiautomatic pistol can only be pulled once when the firing chamber is empty. He contends this establishes Yee's conclusion was hyperbole, and "had no basis in reality or the evidence in this case." Respondent objects to this challenge of Yee's testimony, arguing appellant's authorities are not part of the appellate record. An appellate court is generally limited in its review to matters that are included in the record from the proceedings below and may not consider other matters. (People v. Pearson, supra, 70 Cal.2d at p. 221, fn. 1.) Accordingly, because these matters are not included in the record from the proceedings below, we will not consider the arguments or issues raised in appellant's opening brief at footnote number 12.]

Two cases are instructive. First, in People v. Escobar (1992) 11 Cal.App.4th 502 (Escobar), the defendant was convicted of assault with a firearm. The defendant held a gun but concealed it from the victim by holding it inside a briefcase. The victim heard the defendant cock the weapon. (Id. at p. 503.) On appeal, the defendant argued there was no attempt to use the weapon to inflict injury because he did not exhibit the weapon, point it, or fire it, "but merely cocked it." (Id. at p. 505.) The Court of Appeal determined the victim was aware the defendant was holding a gun and the defendant had a present ability to violently injure. The evidence established "something more than mere preparation." (Ibid.) Escobar noted the victim did not have to see the gun because he

26

could rely on his sense of hearing to perceive the defendant's intent to commit a violent injury. (Ibid.) The evidence was sufficient to establish the defendant intended to willfully commit an act which, had it been completed, its direct and natural consequence was an injury to the victim. (Ibid.)

Second, in People v. Chance (2008) 44 Cal.4th 1164 (Chance) sheriff's officers drove to the defendant's residence to arrest him pursuant to felony warrants. The defendant ran from his residence and an officer pursued him on foot, observing that the defendant was carrying a handgun. The defendant ran around the front end of a trailer and the officer approached, but anticipated an ambush. The officer advanced the other direction around the back of the trailer and, after carefully peering around the corner, he saw the defendant facing the front end of the trailer. (Id. at p. 1168.) The defendant was holding his gun extended forward. The officer trained his weapon on the defendant, who looked back over his shoulder at him. The officer repeatedly told the defendant to drop his weapon, and the officer testified he was in fear for his life and afraid the defendant was going to shoot him at any second. The defendant was arrested and his gun was recovered fully loaded with 15 rounds in the magazine, although the firing chamber held no round. The gun's safety mechanism was off. (Id. at p. 1169.) A jury convicted the defendant of assault with a firearm on a peace officer, along with other offenses. The Court of Appeal reversed the assault conviction, concluding the defendant did not have the "'present ability[ ] to commit a violent injury'" necessary for assault. (Ibid.) The Court of Appeal concluded the defendant's act of pointing his gun at a place where he expected the officer to appear "was not immediately antecedent to a battery." (Ibid.) The Attorney General appealed to the Supreme Court, which reversed.

The Chance court held assault occurs when a defendant's actions enable him to inflict a present injury. However, "[t]here is no requirement that the injury would necessarily occur as the very next step in the sequence of events, or without any delay." (Chance, supra, 44 Cal.4th at p. 1172.) Instead, when a defendant "equips and positions himself to carry out a battery," an assault is present "if he is capable of inflicting injury on the given occasion, even if some steps remain to be taken, and even if the victim or the surrounding circumstances thwart the infliction of injury." (Ibid.) "'Once a defendant has attained the means and location to strike immediately he has the "present ability to injure." The fact an

27

intended victim takes effective steps to avoid injury has never been held to negate this "present ability."' [Citations.]" (Id. at p. 1174.)

Chance determined the defendant's loaded weapon and concealment behind the trailer allowed him to strike immediately at the officer. The officer's evasive maneuver did not deprive the defendant of the required "'present ability'" necessary for conviction of assault. Chance rejected the defendant's argument that an assault did not occur because he never pointed his weapon in the officer's direction. That degree of immediacy" was not necessary. (Chance, supra, 44 Cal.4th at p. 1176.) Instead, the defendant's conduct by positioning himself to strike with a loaded weapon was sufficient to establish the actus reus required for assault. (Ibid.)

Here, appellant cites a series of cases where the defendant either aimed a weapon at a victim or threatened a victim while holding a weapon. He asserts he merely possessed a loaded gun so his conviction for assault was in error. However, this record demonstrates he did more than merely possess a loaded gun.

Appellant was not responsive to Finley's repeated commands to put his gun down and multiple witnesses, including appellant's siblings, testified appellant repeatedly asked Finley to shoot him in the head. During this tense confrontation appellant moved suddenly in the direction of Finley and simultaneously raised his gun arm. Under these facts, the jury had substantial evidence to determine appellant had a present ability to shoot immediately at Finley and moved with an intent to do so. Appellant was equipped and in a position to carry out a battery even if some steps remained to be taken, and even through Finley prevented the infliction of injury. (Chance, supra, 44 Cal.4th at p. 1172.)

Moreover, the jury heard appellant's postarrest statement that he fired two or three "blanks" and then "threw [the gun] on the ground like I can't do nothing with this." It is reasonable to infer from appellant's statements that he attempted to fire his Glock, but was unable to do so and became frustrated. Although conflicting inferences may be drawn regarding whether or not appellant tried to fire his Glock, on appeal we view the evidence in the light most favorable to the judgment (People v. Jones, supra, 57 Cal.4th at p. 960) and presume the existence of any fact the jury could have reasonably deduced from the evidence in support of the judgment.

1
2
(People v. Johnson, supra, 26 Cal.3d at p. 576.) The inference that appellant attempted to fire his Glock is based on more than mere speculation or guesswork.

3
4
5
6
7
8
9
10
11
12
13
Appellant contends he never pointed his weapon in Finley's direction and could not have done so because he was moving away from Finley out of the bedroom. In his reply brief he maintains his conduct "never established that he had actual knowledge or that it was even reasonably foreseeable that his actions would probably and directly result in physical force being applied to Officer Finley." He asserts his conduct may have caused Finley to be afraid but Finley's subjective fear is irrelevant. These arguments are unpersuasive because aiming his weapon was a degree of immediacy not required for conviction of assault. (Chance, supra, 44 Cal.4th at p. 1176.) Further, Finley testified appellant's gun arm began to raise up before appellant exited the bedroom and turned away from him. This conduct, coupled with appellant's postarrest statements, is substantial evidence appellant had the general intent to commit assault regardless of Finley's subjective beliefs.

14
15
16
17
18
19
Based on his recorded statements to Yee, appellant also argues he told Finley he would throw out his gun if the officers left. He claims these statements are consistent with a lack of intent to commit assault with a firearm. However, in rendering its verdicts, it is clear the jury either rejected these statements or determined the remaining evidence established an intent to commit assault with a firearm. It is the trier of fact who makes credibility determinations and resolves factual disputes. (People v. Friend (2009) 47 Cal.4th 1, 41.) We will not reassess the credibility of the evidence on appeal. (Ibid.)

20
21
22
23
24
25
Based on this record, sufficient evidence exists to support the jury's determination appellant had the general intent to commit an assault with a deadly weapon upon Finley, and he had the present ability to do so. (§§ 240, 245, subd. (d)(2).) This evidence was reasonable, credible, and of solid value such that a reasonable jury could find appellant guilty beyond a reasonable doubt in count 1. (People v. Jones, supra, 57 Cal.4th at p. 960; People v. Johnson, supra, 26 Cal.3d at p. 576.) Accordingly, appellant is not entitled to reversal of count 1.

26
Yang, 2015 WL 6460237, at *13–17.

27
28

### 2. Applicable Law

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). There is sufficient evidence to support a conviction if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). "[T]he dispositive question under Jackson is 'whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.'" Chein v. Shumsky, 373 F.3d 978, 982 (9th Cir. 2004) (quoting Jackson, 443 U.S. at 318). Put another way, "a reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." Cavazos v. Smith, 565 U.S. 1 (2011).

In conducting federal habeas review of a claim of insufficient evidence, "all evidence must be considered in the light most favorable to the prosecution." Ngo v. Giurbino, 651 F.3d 1112, 1115 (9th Cir. 2011). "Jackson leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial," and it requires only that they draw "'reasonable inferences from basic facts to ultimate facts.'" Coleman v. Johnson, 132 S.Ct. 2060, 2064 (2012) (citation omitted). "'Circumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction.'" Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995) (citation omitted).

"A petitioner for a federal writ of habeas corpus faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005). In order to grant relief, the federal habeas court must find that the decision of the state court rejecting an insufficiency of the evidence claim reflected an objectively unreasonable application of Jackson and Winship to the facts of the case. Ngo, 651 F.3d at 1115; Juan

H., 408 F.3d at 1275 & n.13. Thus, when a federal habeas court assesses a sufficiency of the evidence challenge to a state court conviction under AEDPA, "there is a double dose of deference that can rarely be surmounted." Boyer v. Belleque, 659 F.3d 957, 964 (9th Cir. 2011). The federal habeas court determines sufficiency of the evidence in reference to the substantive elements of the criminal offense as defined by state law. Jackson, 443 U.S. at 324 n.16; Chein, 373 F.3d at 983.

### 3.      Analysis

The state court was not unreasonable in rejecting this claim. The evidence presented at trial showed that Petitioner had a gun, did not respond to Finley's commands that he put the gun down, and moved suddenly toward Finley while raising his gun arm. Furthermore, his statements following the incident regarding shooting blanks and his frustration that the gun didn't work are sufficient evidence upon which a juror could conclude that he had the requisite intent to commit assault. Although Petitioner disputes he had such intent, the jury concluded otherwise. The Court cannot say that no rational trier of fact could have agreed with the jury. The Court certainly cannot conclude that the Court of Appeal was objectively unreasonable in concluding the evidence was sufficient.

Petitioner is not entitled to relief on this claim.

### C.      Claim Three: Jury Deliberations

Petitioner claims that the trial judge unduly influenced the jury to continue its deliberations after the jury indicated it was deadlocked.

### 1.      State Court Decision

The Fifth District Court of Appeal rejected this claim as follows:

> **II. The Trial Court Did Not Err in Directing the Jury to Deliberate Further.**
>
> On its first day, and after approximately five hours of cumulative deliberations, the jury indicated it could not reach a verdict on count 1 although it had reached a verdict on count 2. The court directed them to continue deliberating.

Appellant asserts the trial court erred and he was prejudiced, requiring reversal of count 1.

**A. Background.**

The jury began its first day of deliberations at approximately 9:59 a.m. That afternoon, the jury requested readback of Finley's entire testimony about his arrival at appellant's residence until appellant's exit from the house with a knife. The parties were informed of the jury's request.

At approximately 2:52 p.m. that same day, the court reporter provided the requested readback testimony and exited the jury room at approximately 3:37 p.m. The jurors, however, had stopped the reporter from reading all of Finley's testimony. Upon learning that issue, the trial court directed the reporter back into the jury deliberation room and she read the remainder of Finley's testimony which was responsive to the jury's request, both from the prosecution and the defense. The court reporter entered the jury deliberation room at approximately 3:51 p.m. to do so and exited at approximately 4:09 p.m. At approximately 4:20 p.m. the jury sent a request to the court asking for its "options" because it was deadlocked and unable to reach a unanimous decision.

At approximately 4:41 p.m. the court reconvened with all parties and explained the jury's notes and the court reporter's readback of testimony. The court informed the parties of its intention to ask the jurors how many polls they had taken and whether there had been any movement in the polls. The court informed counsel it did not believe the jury had been deliberating long enough because the trial required about four and a half days of testimony and the jury had deliberated approximately five hours given its various breaks and the time taken for the readback of testimony. Defense counsel asked the court to inquire about the jury's split. The court indicated it would read CALCRIM No. 3551, noting it was an instruction which the defense had requested, and the court would ask the jurors whether they thought additional time would be helpful to them, or any additional readback.

At approximately 4:55 p.m., the court met with all parties and the jury. The court asked the foreperson if any further deliberations, instructions or reading of testimony would assist the jury in reaching a verdict. The foreperson indicated it would not. The jury had taken five ballots up to that point, and on count 1 they were split "8 to 4." The jury had reached a verdict on count 2, which was not disclosed.

32

The court excused the jury again and met with counsel. At approximately 5:05 p.m. the jury was brought back into court before all parties. Using CALCRIM No. 3551 (which is titled "Further Instruction About Deliberations") the court stated the following to the jury:

"Ladies and Gentlemen, I understand that you are divided at this point apparently 8 to 4 as to one of the counts. Sometimes juries that have had difficulty reaching a verdict are able to resume deliberations and successfully reach a verdict on one or more counts.

"So I ask that you please consider the following suggestions: Do not hesitate to re-examine your own views. Fair and effective jury deliberations require a frank and forthright exchange of views. Each of you must decide the case for yourself and form your individual opinion after you have fully and completely considered all the evidence with your fellow jurors.

"It is your duty as jurors to deliberate with the goal of reaching a verdict if you can do so without surrendering your individual judgment. Do not change your position just because it differs from that of other jurors or just because you or other jurors want to reach a verdict. Both the People and the defendant are entitled to the individual judgment of each juror.

"It is up to you to decide how to conduct your deliberations. You may want to consider new approaches in order to get a fresh perspective. But it is this Court's determination that given the fact that it took four and a half days to present the evidence in this case and that you have spent now some approximately five hours deliberating, and that is taking into consideration the readback of the court reporter, it is this Court's decision that you should spend more time in attempting to reach a verdict. If you cannot, that is fine. But there's a lot of evidence for you to consider. And I don't want any of you to feel pressured because—pressured to reach a decision.

"So I'm going to ask you to return tomorrow morning at 9:00 a.m. to continue your deliberations. If you wish to communicate with me any further, please do so in writing using the juror forms that were provided to you in the jury binder. [¶] ... [¶] We will see you all back

33

here tomorrow morning at 9:00 a.m. [¶] Thank you for your patience and for your diligence in considering this case. Thank you very much."

After the jury left, the court informed counsel that, if they had not heard from the jurors by noon tomorrow, the jury would be contacted the following day at 1:30 p.m. "to inquire as to their status." If they were still in the same position or close to it with an 8 to 4 split, the court would consider declaring a mistrial.

The following morning, the jury resumed deliberations at approximately 9:10 a.m. At approximately 9:18 a.m., the jury requested a laptop in order to listen to appellant's recorded interview with Yee from appellant's hospital room. A laptop was provided at approximately 9:28 a.m., and the jury returned the laptop and resumed deliberations at approximately 10:03 a.m. Thirty minutes later, the jury informed the court it had reached a verdict.

## B. Standard of review.

Section 1140 provides that "the jury cannot be discharged after the cause is submitted to them until they have agreed upon their verdict ... unless, at the expiration of such time as the court may deem proper, it satisfactorily appears that there is no reasonable probability that the jury can agree." In the event of a deadlock, "[t]he court may ask jurors to continue deliberating where, in the exercise of its discretion, it finds a 'reasonable probability' of agreement." (People v. Pride (1992) 3 Cal.4th 195, 265.)

It is within a trial court's sound discretion whether to declare a hung jury or order further deliberations. (People v. Bell (2007) 40 Cal.4th 582, 616.) When ordering further deliberations, a trial court must be careful not to coerce the jury into giving up its independent judgment in consideration of compromise and expediency. (Ibid.) However, a trial court may direct further deliberations if it reasonably concludes its directions will enable the jurors to enhance their understanding of the case so long as the jurors are not pressured to reach a verdict based on the matters already discussed and considered. (Ibid.)

## C. Analysis.

Appellant asserts that the trial court's use of CALCRIM No. 3551, coupled with its extemporaneous statements,

34

effectively told the four minority jurors "that they must take additional time to re-examine their views about the evidence in light of the majority's views." Appellant argues that the trial court "erroneously skewed the jury's deliberative process toward the result favored by the majority."

There is a dispute between the parties regarding whether or not appellant has forfeited or waived this issue on appeal. We need not address this dispute because, when we presume no forfeiture or waiver occurred, appellant's contentions are unpersuasive on the merits. Nothing in the record suggests the jury was coerced. The court made no statements that could be deemed as exerting undue pressure on any juror, and the court made no threats. The court did not indicate a verdict had to be reached and, indeed, the court said it was fine if they could not reach a verdict. The jurors were told not to feel pressured to reach a decision and they were reminded of their right to retain their individual opinions.

Even when a jury has deliberated for a substantial amount of time and indicates it is unable to reach a verdict, a trial court still retains discretion to require further deliberation. (See People v. Sandoval (1992) 4 Cal.4th 155, 196–197 [no abuse of discretion where court ordered more deliberations following five month trial and deliberations that lasted a little over 14 hours]; People v. Breaux (1991) 1 Cal.4th 281, 319–320 [jury informed court it had reached an impasse after four days of deliberation, indicated there was no chance of a verdict upon further deliberation, and was properly asked twice to deliberate further].)

Here, the court was principally concerned the jury had not deliberated for a sufficient time relative to the length and volume of the evidence received. It was not unreasonable for the court to conclude, in light of the fact the trial itself had taken four and a half days, the jury should put in a little more time than the approximate five hours it had deliberated up to that point. In light of the trial court's concerns and its statements to the jury, an abuse of discretion does not appear on this record. (People v. Sandoval, supra, 4 Cal.4th at pp. 196–197; People v. Breaux, supra, 1 Cal.4th at p. 320.)

Yang, 2015 WL 6460237, at *11–13.

## 2.    Applicable Law

Coercive statements made by a trial court to a jury violate a defendant's rights to due process and a fair trial. See Lowenfield v. Phelps, 484 U.S. 231, 241 (1988).

"Whether the comments and conduct of the state trial judge infringed [a] defendant's due process right to an impartial jury and fair trial turns upon whether 'the trial judge's inquiry would be likely to coerce certain jurors into relinquishing their views in favor of reaching a unanimous decision.'" <u>Jiminez v. Myers</u>, 40 F.3d 976, 979 (9th Cir. 1994) (quoting <u>Locks v. Sumner</u>, 703 F.2d 403, 406 (9th Cir.1983)). In order to determine whether a trial court's comments were impermissibly coercive, the reviewing court must evaluate them "in [their] context and under all the circumstances." <u>Lowenfield</u>, 484 U.S. at 237. "[A] trial court's neutral inquiry into the division of the jury without other circumstances suggestive of coercion does not deprive a defendant of due process." <u>Jiminez</u>, 40 F.3d. at 980.

### 3. Analysis

Although the state court did not address this claim on federal constitutional grounds, rejection of the claim was not unreasonable. The totality of the circumstances does not suggest that the trial court's actions and statements were coercive. The minority jurors were not coerced into relinquishing their views. To the contrary, <u>all</u> of the jurors were instructed to re-examine their views, and to reach a unanimous verdict only if they could do so without surrendering their individual judgment. Additionally, although the jurors were asked for a vote count, such questions, standing alone, are not impermissible. <u>See</u> <u>Jiminez v. Myers</u>, 40 F.3d 976, 980 (1993); <u>see also</u> <u>Todd v. Lamarque</u>, 230 Fed. Appx. 672, 678 (9th Cir. 2007); <u>Maldonado v. Gibson</u>, 2014 WL 5361447, at *13-16 (C.D. Cal. Oct. 20, 2014) (trial court did not coerce jury by asking for the numerical division). Furthermore, the trial court did not ask whether the majority of votes were for a verdict of guilty or not guilty, nor did the court attempt to persuade the jurors toward either verdict.

Because the court's comments were neutral and not coercive, Petitioner's right to due process was violated. The Court of Appeal's determination was not contrary to clearly established federal law or an unreasonable determination of the facts.

Petitioner is not entitled to relief on this claim.

## V.     Motion for Reconsideration

Petitioner requests reconsideration of the Court's prior order (ECF No. 16) denying his request for the appointment of counsel.

As Petitioner has been advised, there currently exists no absolute right to appointment of counsel in habeas proceedings. See, e.g., Anderson v. Heinze, 258 F.2d 479, 481 (9th Cir. 1958); Mitchell v. Wyrick, 727 F.2d 773, 774 (8th Cir. 1984). However, Title 18 U.S.C. § 3006A(a)(2)(B) authorizes the appointment of counsel at any stage of the case if "the interests of justice so require." See Rule 8(c), Rules Governing Section 2254 Cases. The Court previously found that the interests of justice do not require the appointment of counsel in this case at the present time, and nothing in Petitioner's motion changes the Court's view. Although Petitioner lacks familiarity with the law, he has adequately presented and pursued his case.

Accordingly, this motion for reconsideration should be denied.

## VI.     Motion for Evidentiary Hearing

Petitioner requests an evidentiary hearing. The motion largely presents argument on the above-described claims that may be made upon the current factual record. Those arguments have been considered herein.

However, Petitioner also wishes to present mental health records from the period of his incarceration to attack the denial of his motion to suppress on Miranda grounds. Claims that he was incompetent to validly waive his Miranda rights are not contained in the petition and have not been exhausted. Furthermore, consideration of evidence at this stage is improper. In reviewing Petitioner's claims and determining if the state court decision was reasonable, this Court may only rely upon the record before the state court. See Cullen v. Pinholster, 131 S. Ct. 1388, 1398 (2011) ("We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."). As such, in the initial review of Petitioner's claims, this Court may not examine evidence that was not presented to the state court. Because the Court has

concluded that the state court decision was not unreasonable, there is no basis to proceed to an evidentiary hearing.

**VII.     Conclusion and Recommendation**

Based on the foregoing, it is HEREBY RECOMMENDED that:

    1.  Petitioner's motion for reconsideration (ECF No. 17) be denied;

    2.  Petitioner's motion for evidentiary hearing (ECF No. 18) be denied; and

    3.  The petition for writ of habeas corpus be DENIED with prejudice.

The findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Within **thirty** (30) days after being served with the findings and recommendation, any party may file written objections with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within fourteen (14) days after service of the objections. The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal.  Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   March 19, 2018              /s/ Michael J. Seng

UNITED STATES MAGISTRATE JUDGE

38